06 CV 1864

FRANKFURT KURNIT KLEIN & SELZ, PC

Edward Hernstadt (EH 9569)
488 Madison Avenue
New York, New York 10022
(212) 826-5582
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
JAMES SAVAGE,                                                :
                                                             :
                              Plaintiff,                     :   06 CIV _____ (_____)
                                                             :
          -against-                                          :   **COMPLAINT**
                                                             :
THOMAS WEISEL PARTNERS                                       :
GROUP, INC.,                                                 :   JURY TRIAL DEMANDED
                                                             :
                              Defendant.                     :   ECF CASE
                                                             :
------------------------------------------------------------ x

Plaintiff, James Savage, by his attorneys, Frankfurt Kurnit Klein & Selz, PC, alleges for his amended complaint against defendant as follows:

### NATURE OF THE ACTION

1.  This is an action to remedy discrimination on the basis of age and religion in the terms, conditions and privileges of employment under the New York State Executive Law and the New York City Human Rights Law, New York City Administrative code, §8101 et. seq.

2.  Mr. Savage was employed by Thomas Weisel Partners Group, LLC, which has been fully merged into and succeeded in all respects by Thomas Weisel Partners Group, Inc. ("TWP" or the "Firm") from January 12, 1999 until his discharge effective April 1, 2003.

## JURISDICTION AND VENUE

3. This suit constitutes a dispute between citizens of different states and includes an amount in controversy in excess of $75,000.00. This court thus has jurisdiction over the action by virtue of 28 U.S.C. §1332(a).

4. Venue is proper in this judicial district pursuant to 28 U.S.C §1391(a) as plaintiff resides in the Southern District of New York.

5. This court has personal jurisdiction over the defendant in that TWP regularly solicits, engages and otherwise transacts business within the State of New York. Plaintiff's employment with defendant TWP, which is the subject of this action, took place in New York.

## **PARTIES**

6. Plaintiff, James Savage is a citizen of the United States and the State of New York and resides at 285 Central Park West, New York, New York. Savage was born on August 31, 1948, and is 56 years old. He is an observant Jew, observing the traditional Jewish dietary laws, holidays and the Sabbath.

7. Upon information and belief, Defendant TWP is a Delaware corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Francisco, California. TWP is an investment firm which serves institutional investors and companies through its research, institutional sales, trading, and investment banking departments.

## STATEMENT OF FACTS

8. Savage is an experienced financial research analyst specializing in the technology industry.

9. In December 1998, while employed at BT Alex Brown, Savage received a telephone call from Jay Jacobs at TWP, which had recently formed as an investment firm, inquiring if he would be interested in joining the Firm.

10. Upon information and belief, TWP was looking for established Wall Street talent that would give it immediate credibility among institutional investors and companies it intended to serve.

11. Savage met with Thomas Weisel, as well as other members of the Firm, and, in January 1999, agreed to join the Firm as a founding partner, pursuant to the terms of an Employment Agreement.

12. When Jim Savage joined TWP in January 1999, he was the first research partner not to have come from Weisel's former firm, Montgomery Securities, and as an Institutional Investor All-American analyst, he provided instant credibility to the Firm's research effort.

13. Savage was the number two ranked analyst in his sector in 1998, and had become known for his annual sector conferences for institutional investors, which he led annually since 1996.

14. Plaintiff began working for TWP as a senior technology research analyst. In this capacity, he was responsible for providing coverage for more than 10 companies in order to identify investment opportunities for the Firm's clients.

15. Savage was extremely successful in his position. During his tenure with the Firm his relationships and reputation among senior managers at public companies and among private equity investors led to numerous deals which produced substantial revenues for the firm.

16. In April 1999, TWP held its first investor conference, i.e., Savage's annual Electronics Manufacturing Services conference. Concurrent with the conference, Savage published his first major industry sector report at TWP.

17. In 1999, Savage received Institutional Investor recognition as runner-up in his sector.

18. Savage wrote for various electronics industry journals, spoke at industry conferences, and provided TWP with greater name recognition when he successfully negotiated to place a TWP Supply Chain Stock Index as a regular feature in Electronics Buyers News.

19. From the beginning, Savage's stocks were among the largest commission generators at TWP (with more than $3 million in commissions by 9/99).

20. In or about early June 2000, Savage's strong and long-standing relationship with senior management and board members of Jabil Circuit, Inc. was responsible for enabling TWP to handle what TWP later advertised as a "landmark overnight transaction" by Jabil Circuit. TWP recognized revenues of more than $16 million from this transaction.

21. In fact, this transaction was the first overnight transaction in the history of TWP, and still represents more than 60% of all "overnight bought deal" funds raised since the firm's inception.

22. In the wake of this huge success, which underscored Plaintiff's abilities as an analyst, Goldman Sachs approached Savage about joining it.

23. Relying on assurances from Weisel and TWP regarding compensation, Savage decided to remain at TWP.

24. In 2000, as the Research Head of TWP's Electronics Supply Chain (later Electronics & Power Technology) "Tiger Team," Savage organized an Electronics Supply Chain

Conference featuring companies in both Savage's sector and in subsectors of other analysts on the team.

25. During his tenure as the Research Coordinator of the Tiger Team, Savage hired and trained a number of younger professionals, three of whom later became senior analysts at TWP and two who became analysts at other sell-side firms.

26. In 2000, more than $13 million in brokerage sales commissions were generated by Savage's coverage and TWP became a leader in Electronics Supply Chain investment banking.

27. In both 2000 and 2001, Savage was recognized by the Wall Street Journal as the number one stock picker for Electronics in their well-known "Best on the Street Analyst Survey."

28. In 2001, in the midst of the technology downturn, Savage maintained his strong market share, generating $13.4 million in total commission dollars (more than 7% of total commissions). In addition, in 2001 he ranked number three in institutional votes (voting being a key determinant of firm trading revenue with large institutions), and had approximately double the average analyst's trading market share.

29. In early 2002, with technology stocks still in the doldrums, Savage's sector underperformed the market. However, by mid-year 2002, Savage's "Strong Buy" stocks ranked fourth in performance for the Firm. And although overall commissions declined, he still ranked number eight in commissions and number four in client votes (out of 38 analysts) as of July 2002.

30. However, beginning in September 2002 (four months before the decision was made to terminate Savage by the Executive Committee headed by Thomas Weisel), Savage's commissions declined as a result of adverse actions taken against him by the Firm.

31. In October 2002, despite creating and producing a new publication "The Semi and Supply Chain Quarterly," which included analysis by five analysts (including a major report by Savage) and an introduction by Savage, and despite producing a total of 11 reports, Savage was not allowed to speak at TWP's morning call for the entire month. The morning call is very important in alerting TWP sales staff to investment opportunities.

32. Despite the actions of TWP limiting Savage's ability to perform, the objective criteria at the end of October 2002 showed Savage number four in the Firm for the year in client votes (out of 36 analysts), number eight in commissions, number seven in Strong Buy stock performance, and number eight in media hits.

33. In early 2003, Savage continued to write extensively, began developing research on a new sector, and brought seven of his coverage companies to TWP's Tech 2003 conference on February 3-5.

34. During Savage's tenure, as TWP became more established, it began hiring younger talent to fill its ranks.

35. Upon information and belief, Thomas Weisel wanted to present a "younger face" to its clients and no longer needed the established talent - such as Savage - that had originally been hired to launch the Firm.

36. On or about March 11, 2003, Mark Manson, Director of Research and the immediate supervisor of Savage, verbally stated to Savage at a meeting that his employment with TWP was terminated effective immediately, but that he would be paid through April 1, 2003.

37. Upon information and belief, this decision was made by the Executive Committee of TWP in January 2003.

38. At that initial meeting, Manson advised Savage that his termination was not based upon his job performance and that Manson personally wanted Savage to remain with TWP.

39. Manson further stated that TWP's Executive Committee did not believe that Savage's electronics manufacturing services sector was economically viable based upon the current state of the securities markets.

40. Manson further stated that TWP did not believe that "someone his age" had "the energy" to establish new coverage in the area.

41. Upon information and belief, after his termination, TWP telephoned executives of companies covered by Savage to announce Savage's departure from TWP and to reassure them that TWP would continue to cover and service the electronics manufacturing services sector after his departure.

42. Thomas Weisel told a senior executive at one of the companies Savage covered that TWP would have a "young tiger" [or words to that effect] cover his company after Savage's departure from TWP. Upon information and belief, Weisel informed other companies in Savage's sector of this same information.

43. Following Savage's discharge, TWP continued to cover and service the electronics manufacturing services sector.

44. Following Savage's discharge, the work he had been doing was assigned to Matt Sheerin who is, upon information and belief, at least 10 years younger than Savage and non-Jewish.

45. Upon information and belief, at the time Savage commenced his employment, there were eight founding partners in the New York office, of which he was one. 87 ½ % of these founding partners were over the age of 40 and 50% of them were Jewish.

46. Upon information and belief, at the time Savage was involuntarily terminated, 57% of the founding partners in New York over 40 were terminated involuntarily and 75% of the New York-based Jewish founding partners were terminated involuntarily.

47. When looking at the figures for the entire firm, a similar pattern can be seen. Four out of five (or 80%) of all of the founding partners at TWP over the age of 50 were fired or forced to quit. By 2003, TWP fired or forced out about half of the founding partners, most of whom were over 40. Of the original research partners, half of those over 40 were discharged while only one of four partners under 40 was discharged.

48. The work which had previously been handled by these older partners was assigned to employees who were substantially younger. Upon information and belief, of the current banking and research partners, 65% are under 40.

49. Upon information and belief, Savage's employment with TWP was terminated because of his age and religion, and not because of his job performance or any other lawful factor.

## COUNT I

### (Age Discrimination in violation of New York City Law)

50. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 49 as if they were fully restated herein.

51. By its actions, TWP has violated the New York City Administrative Code, §8101 et seq., commonly known as the New York City Human Rights Law, by discrimination on the basis of age.

52. As a result of TWP's discrimination, Mr. Savage has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his

employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT II

### (Religious Discrimination in violation of New York City Law)

54. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 52 as if they were fully restated herein.

54. By its actions, TWP has violated the New York City Administrative Code, §8101 et seq., commonly known as the New York City Human Rights Law, by discrimination on the basis of religion.

55. As a result of TWP's discrimination, Mr. Savage has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT III

### (Age Discrimination in violation of New York State Law)

56. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 55 as if they were fully restated herein.

57. By its actions, TWP has violated the New York State Executive Law, by discrimination on the basis of age.

58. As a result of TWP's discrimination, Mr. Savage has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT IV

**(Religious Discrimination in violation of New York State Law)**

59.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 58 as if they were fully restated herein.

60.   By its actions, TWP has violated the New York State Executive Law, by discrimination on the basis of religion.

61.   As a result of TWP's discrimination, Mr. Savage has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

WHEREFORE, plaintiff respectfully requests that this court grant judgment for plaintiff and that it order and award plaintiff the following relief against defendants:

(1)   A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated plaintiff's rights as secured by the New York City Administrative Code, § 8-101, et seq. and the New York State Executive Law;

(2)   An injunction restraining and enjoining Defendants from engaging in further discriminatory acts;

(3)   Reinstatement of plaintiff to the highest position to which plaintiff was and would be entitled, with salary, benefits, title, job responsibilities and other terms of employment commensurate with such position;

(4)   Damages in the form of (a) back pay with interest based on plaintiff's appropriate compensation had he not been discriminated against; (b) front-pay; and (c) reimbursement for lost pension, social security, experience, training opportunities and other benefits, in an amount to be shown at trial;

(5) Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount not less than $2,000,000;

(6) Punitive damages in an amount not less than $3,000,000;

(7) Attorneys fees;

(8) Costs and disbursements;

(9) Interest; and

(10) Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

Dated: New York, New York
March 8, 2006

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____
Edward Hernstadt, Esq. (EH 9569)
488 Madison Avenue
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiff James Savage*